# No. 23-3115

# In the
# United States Court of Appeals
# for the Eighth Circuit

Bob Cajune; Cynthia Cajune; Kalynn Kay Aaker; LION 194; John Doe, #1; Mary Roe, #1-7; S.W., minor, by Kalynn Kay Aaker; C.W., minor, by Kalynn Kay Aaker; O.W., minor, by Kalynn Kay Aaker; H.W., minor, by Kalynn Kay Aaker,

*Plaintiffs-Appellants,*

vs.

Independent School District 194; Doug Van Zyl, or any successor, in his official capacity as Superintendent of Independent School District 194,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
Case No. 22-CV-2135-JWB-ECW
Honorable Judge Jerry W. Blackwell

_____

## BRIEF OF APPELLANTS

_____

Douglas P. Seaton
James V. F. Dickey
UPPER MIDWEST LAW CENTER
8421 Wayzata Boulevard, Suite 300
Golden Valley, MN 55426
(612) 428-7002
doug.seaton@umlc.org
james.dickey@umlc.org

*Attorneys for Appellants*

## SUMMARY OF THE CASE

Plaintiffs-Appellants ("Appellants") are taxpayers, parents, students, and an unincorporated organization residing in and paying taxes to Independent School District 194 (the "District"). At the urging of local community activists, the District allowed, and used taxpayer dollars to pay for, "Black Lives Matter" posters created by activists for teachers and employees to hang in the schools' hallways and classrooms. Appellants object to these posters because they believe they support racism and racial inequality, instead of unity and equality. Appellants asked the District to allow alternative viewpoints alongside the posters. The District refused. The District thus discriminated against Appellants' viewpoint and forced them to subsidize private speech with which they disagree. Consequently, Appellants filed this lawsuit.

Appellees moved to dismiss. The district court granted Appellees' motion and denied the Doe and Roe Appellants' motion to proceed pseudonymously, and judgment was entered on August 22, 2023.[1] Appellants timely appealed on September 19, 2023.[2] The Court should hear oral argument because it presents this Circuit's first opportunity to apply the government-speech doctrine as described by *Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022). Appellants request a total of 30 minutes of oral argument, 15 minutes per side.

---

[1] App. 67–84; R. Doc. 38, Order; App. 85; R. Doc. 39, Judgment.

[2] App. 86; R. Doc. 40, Notice of Appeal.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eighth Circuit Local Rule 26.1A, Appellants are not a corporation.

# TABLE OF CONTENTS

SUMMARY OF THE CASE............................................................................ i

CORPORATE DISCLOSURE STATEMENT..................................................... ii

TABLE OF CONTENTS ............................................................................ iii

TABLE OF AUTHORITIES ......................................................................... v

JURISDICTIONAL STATEMENT..................................................................1

STATEMENT OF LEGAL ISSUES ................................................................2

STATEMENT OF THE CASE.......................................................................3

   I.    District Policy Prohibits Political and Controversial Posters Unless the District Creates a Limited Public Forum. .....................................................4

   II.   Under Pressure from Activists, the District Allowed "Black Lives Matter" Posters.......................................................................7

   III.   The District Continued to Acknowledge that "Black Lives Matter" is Reasonably Perceived as Support for a Radical Political Ideology............11

   IV.   The District Rejected Appellants' Demand for Equal Treatment of Political Speech in the Designated Forum..................................................16

   V.   Procedural History. ....................................................................................18

SUMMARY OF THE ARGUMENT ..............................................................20

ARGUMENT..........................................................................................24

   I.    Standard of Review. ...................................................................................24

   II.   The Poster Series Does Not Constitute Government Speech Under *Shurtleff*'s Holistic Analysis. ...................................................................25

        A.   There is no historical evidence that the District has used posters in schools hung by teachers to convey a government message. .............26

        B.   The history of the poster series' development shows that its political expression belongs to private activists.................................................29

        C.   The public is more likely to perceive the author of the poster series as individual teachers and private activists, not the District..............31

D. The District Court failed to recognize that displaying the phrase "Black Lives Matter" on a poster reasonably endorses a political movement, which is private political speech. ....................................35

E. As alleged in the Amended Complaint, the District did not actively shape or control the poster series. ......................................................37

III. Appellants Have Stated a Claim for Relief Under the First Amendment...........................................................................................41

A. Appellees engaged in unconstitutional viewpoint discrimination. .....42

B. The poster series constitutes a compelled subsidy that violates Appellants' First Amendment rights...................................................44

IV. The Doe and Roe Plaintiffs Meet the Standard to Proceed Pseudonymously. .........................................................................................45

**CONCLUSION**...............................................................................................**49**

**CERTIFICATE OF COMPLIANCE** .................................................................**50**

**CERTIFICATE OF SERVICE** ........................................................................**51**

# TABLE OF AUTHORITIES

**STATUTES**

42 U.S.C. § 1983 ...................................................................................18

42 U.S.C. § 1988 ...................................................................................18

Minn. Stat. § 123B.09, subd. 1 .............................................................30

**CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................24

*Brensahan v. City of St. Peters*, 58 F.4th 381 (8th Cir. 2023)..............42

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
     965 F.3d 1238 (11th Cir. 2020). ........................................ 24, 25, 46

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*,
     561 U.S. 661 (2010) ....................................................................43

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985) ....28

*Doe 3 v. Elmbrook Sch. Dist.*, 658 F.3d 710 (7th Cir. 2011),
     *rev'd en banc*, 687 F.3d 840 (7th Cir. 2012) .......................... 46, 47, 48

*Doe v. Blue Cross & Blue Shield United of Wis.*,
     112 F.3d 869 (7th Cir. 1997). ......................................................46

*Doe v. Porter*, 370 F.3d 558 (6th Cir. 2004). .......................................46

*Doe v. Univ. of Ark.*, 713 Fed. App'x 525 (8th Cir. 2018)
     (Unpublished per curiam)......................................................... 24, 45

*Doe v. Village. of Deerfield*, 819 F.3d 372 (7th Cir. 2016)....................46

*Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000). ..........26

*Gerlich v. Leath*, 861 F.3d 697 (8th Cir. 2017) ............................... 35, 43

*Higher Soc'y of Ind. v. Tippecanoe Cnty.*, 858 F.3d 1113 (7th Cir. 2017) ..............28

*Ind. Univ. Chapter of Turning Point USA v. City of Bloomington*,
     641 F. Supp. 3d 548 (S.D. Ind. 2022) ...........................................32

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)................... 44, 45

*Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005) .......................39

*Matal v. Tam*, 582 U.S. 218 (2017). ............................................................. passim

*McGriff v. City of Miami Beach*, No. 22-12863, 2023 U.S. App. LEXIS
    28656 (11th Cir. Oct. 27, 2023) ........................................................40

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
    951 F.3d 952 (8th Cir. 2020). ..................................................... 24, 35

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ................................... passim

*Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009) ..........................................32

*Roe v. Dettelbach*, 59 F.4th 255 (7th Cir. 2023) .........................................46

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ..........42

*Sealed Plaintiff v. Sealed Defendant #1*,
    537 F.3d 185 (2d Cir. 2008) .................................................. 46, 48, 49

*Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022) ..................................... passim

*Speech First, Inc. v. Sands*, 69 F.4th 184 (4th Cir. 2023) ............................43

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ..........................45

*United States v. Pilcher*, 950 F.3d 39 (2d Cir. 2020) ..................................48

*W.N.J. v. Yocom*, 257 F.3d 1171 (10th Cir. 2001) .......................................45

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ...................................................... 27, 28, 39, 43

*Wishnatsky v. Rovner*, 433 F.3d 608 (8th Cir. 2006) ...................................44

*Women for Am. First v. Adams*, 21-485-cv, 2022 U.S. App. LEXIS 14645
    (2d Cir. May 27, 2022). ........................................................ 32, 33

*Zayed v. Associated Bank, N.A.*, 779 F.3d 727 (8th Cir. 2015). .......................24

## OTHER AUTHORITIES

A Bill for Establishing Religious Freedom,
    in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950) ...................................43

Fed. R. Civ. P. 12(b)(6) .....................................................................23

Fed. R. Civ. P. 8. ..........................................................................23

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(1), and 2201. The district court dismissed the Amended Complaint and entered judgment on August 22, 2023. Appellants timely filed the notice of appeal on September 19, 2023. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

# STATEMENT OF LEGAL ISSUES

(1) Whether the district court erred by holding that the poster series at issue is government speech and not subject to First Amendment challenge when the poster series was demanded, designed, and edited by private activists and is displayed at the sole discretion of teachers and staff in a *de facto* public forum.

Apposite Cases and Statutes:
1. *Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022);
2. U.S. Const. amend. 1;
3. *Matal v. Tam*, 582 U.S. 218 (2017).

(2) Whether the district court erred by granting Appellees' motion to dismiss when Appellants have stated a claim for relief under the First Amendment and 42 U.S.C. § 1983 for viewpoint discrimination and compelled subsidy.

Apposite Cases and Statutes:
1. U.S. Const. amend. 1;
2. 42 U.S.C. § 1983;
3. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995);
4. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018).

(3) Whether the district court erred by holding that the Doe and Roe Appellants did not meet the standard to proceed pseudonymously despite their well-pleaded allegation of physical violence and assault because of their political views, and where the district court failed to consider if there is any cost to the Appellee District or the public from anonymity.

Apposite Cases and Statutes:
1. *Doe v. Village. of Deerfield*, 819 F.3d 372 (7th Cir. 2016);
2. *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185 (2d Cir. 2008);
3. *Doe 3 v. Elmbrook Sch. Dist.*, 658 F.3d 710 (7th Cir. 2011), *rev'd en banc*, 687 F.3d 840 (7th Cir. 2012).

## STATEMENT OF THE CASE

In the wake of the death of George Floyd and subsequent riots and protests in 2020, teachers and community activists within Lakeville Area Schools (the "District") demanded permission to hang posters endorsing the political slogan "Black Lives Matter" on the walls of the District's classrooms and hallways.[3] At first, the District refused because its own policy prohibited the endorsement of one side of a controversial political issue in the school.[4]

Eventually, however, the District allowed community activists to create and design Black Lives Matter posters on the taxpayers' dime.[5] As the Amended Complaint alleges, the District exercised no meaningful editorial control over the posters, but instead allowed private individuals to edit the posters before allowing teachers to hang them "if they feel it has an instructional value or value in the classroom."[6] By allowing the posting of the poster series in the District's hallways and classrooms by private third parties, the District created a *de facto* public forum.[7]

---

[3] App. 8; R. Doc. 17, Am. Compl. ¶ 29.

[4] App. 8, 20–21; R. Doc. 17, Am. Compl. ¶¶ 27–29, 56.

[5] App. 9–10; R. Doc. 17, Am. Compl. ¶ 43.

[6] App. 11–13; R. Doc. 17, Am. Compl. ¶ 39.

[7] App. 23–24; R. Doc. 17, Am. Compl. ¶ 63.

Appellants are taxpayers, parents, and an unincorporated organization, LION 194 (Liberty In Our Neighborhood 194), residing and paying taxes in the District.[8] They oppose the message of the "Black Lives Matter" posters because it endorses a radical neo-Marxist, separatist political movement and promotes inequality.[9] When Appellants sought to allow the hanging of posters endorsing a different, more inclusive view—"All Lives Matter" or "Blue Lives Matter"—in the District, the District refused. Yet Appellants' taxpayer dollars subsidize the poster series.[10]

The District is an independent school district authorized by and constituting a political subdivision or agency of the State of Minnesota to operate public schools in Lakeville, Minnesota.[11] Defendant Doug Van Zyl is the superintendent of the District and is sued in his official capacity only.[12]

## I. District Policy Prohibits Political and Controversial Posters Unless the District Creates a Limited Public Forum.

Following the death of George Floyd and the subsequent riots and protests in the summer of 2020, teachers, staff, and activists in the District demanded to be allowed to display "Black Lives Matter" posters in District schools' halls and classrooms. At

---

[8] App. 5–7; R. Doc. 17, Am. Compl. ¶¶ 18–21.

[9] App. 26; R. Doc. 17, Am. Compl. ¶ 74.

[10] App. 26; R. Doc. 17, Am. Compl. ¶¶ 73, 74.

[11] App. 7; R. Doc. 17, Am. Compl. ¶ 22.

[12] App. 7; R. Doc. 17, Am. Compl. ¶ 23.

first, then-Superintendent Michael Baumann told the activists, "no."[13] The reason why: District Policy 535. That policy prohibits "[s]chool district employees, while acting in the capacity of a school district employee," from engaging in "any conduct that is intended to be or that reasonably could be perceived as endorsing or opposing specific political issues or political candidates."[14] Second, the District itself must "maintain neutrality as to all political campaigns and issues."[15]

As Superintendent Baumann explained in a September 22, 2020 email to District parents and community members, posters displaying the "Black Lives Matter" political slogan would violate the policy and, as a result, would not be allowed in District schools.[16] As Superintendent Baumann recognized, the phrase "Black Lives Matter" is linked to "specific political issues being debated today," like "defunding the police."[17] In other words, Superintendent Baumann recognized that the phrase "Black Lives Matter" is a controversial political statement and hanging a poster would be endorsement.[18] That same day, after activists demanded the posters again

---

[13] App. 8; R. Doc. 17, Am. Compl. ¶¶ 27, 29.

[14] App. 56; R. Doc. 26-1, Ex. 1 at 22–23 (ISD Policy 535 IV(A)(5)).

[15] App. 55; R. Doc. 26-1, Ex. 1 at 21 (ISD Policy 535 II(A)).

[16] App. 8; R. Doc. 17, Am. Compl. ¶ 29.

[17] Erin Golden, *Lakeville schools' ban on Black Lives Matter signs prompts debate*, StarTribune (Sept. 29, 2020), https://www.startribune.com/lakeville-schools-ban-on-black-lives-matter-signs-prompts-debate/572568192/ (accessed Nov. 10, 2023).

[18] App. 9; R. Doc. 17, Am. Compl. ¶ 32.

at a District School Board meeting, Superintendent Baumann responded with the same message: District policy prohibited these political posters.[19] And again, on October 6, 2020, at a Board of Education Work Session, Superintendent Baumann reaffirmed that "Black Lives Matter" posters would violate Policy 535.[20]

In sum, according to Policy 535, the default in District schools is silence from teachers, staff, and the District itself on controversial political issues like Black Lives Matter. The only exception is that "[t]he building principal, with approval of the Superintendent and the School Board, may designate specific property for facilities of the school district as limited public open for certain expressive activity such as political speech."[21] In that case, the principal and superintendent are responsible "for ensuring equality of treatment toward all candidate[s] and issues."[22] This is the only way that *any* political speech is allowed in schools' halls and classrooms. The District itself, on the other hand, is forbidden from ever expressing a viewpoint.[23]

By December 2020, District Board meetings and work sessions devoted a substantial amount of their meeting time to implementing race-based preferential

---

[19] App. 8–9; R. Doc. 17, Am. Compl. ¶ 30.

[20] App. 9; R. Doc. 17, Am. Compl. ¶ 31.

[21] App. 57; R. Doc. 26-1, Ex. 1 at 23 (ISD Policy 535 IV(C)(2)).

[22] *Id.*

[23] App. 56–57; R. Doc. 26-1, Ex. 1 at 22–23 (ISD Policy 535 II(A), IV(A)(5)).

treatment for select students at District schools.[24] But vocal staff, board members, and public activists continued to push for "Black Lives Matter" posters in the classrooms.[25] Although Superintendent Baumann discussed the possibility of "policy review," Policy 535 was not changed, and the District never publicly discussed the design or creation of Black Lives Matter posters for the District in 2020.[26]

## II. Under Pressure from Activists, the District Allowed "Black Lives Matter" Posters.

Nevertheless, by the Spring of 2021, the activists' pressure apparently proved to be too much. At the Board of Education Special Work Session on March 17, 2021, several statements by District staff evidenced an intent to allow certain private viewpoints to be expressed on schools' hallways and classroom walls.[27]

a) Stephanie Kass, executive director of communications and public relations, stated that "the purpose and our goal here is really to provide clarity around Policy 535 . . . but also *to meet the requests of several of our staff members looking to put up posters affirming our students and our classrooms*." (emphasis added).

b) Referring to the two posters containing the phrase "Black Lives Matter," Kass said that "*the last one is truly our reason for even doing this poster series*, to affirm that black lives matter in our community in our schools and to help our BIPOC students feel welcome within our classrooms and to meet the needs of our staff who are looking to put up posters to affirm their value in Lakeville schools." (emphasis added).

---

[24] App. 9; R. Doc. 17, Am. Compl. ¶ 33.

[25] App. 10; R. Doc. 17, Am. Compl. ¶ 37.

[26] App. 9; R. Doc. 17, Am. Compl. ¶ 33.

[27] App. 11–13; R. Doc. 17, Am. Compl. ¶ 39.

c) Regarding the poster series, Baumann stated, "we're trying to continue to do some vetting and get some feedback around all of these. So . . . our objective is to be able to not only provide these, branded with the District, but also I want to make sure we share with our educators and those who would be deploying these some guidance and direction around that as well."

d) Describing the poster series to those awaiting its unveiling, another Board member stated, "so I think the answer is very clear, though, that it's going through our Equity group, it's going through our students, it's going through our staff, it's going through other advisory committees . . . ."

e) Correcting a Board member's statement, Superintendent Baumann stated that, "Well, I don't know if I would say our goal is to have them up in the schools. Our goal is to *let the teachers have the opportunity and to use these if they feel it has an instructional value or value in their classrooms*. We're not gonna go running around and hang every single one of these up all over the place. That's why we need to provide the direction for our educators and let them use these . . . . our intentions aren't necessarily to go around and make sure we hang them up everywhere. *It's really about what the classrooms and the teachers want to do*." (emphasis added).

f) Lydia Lindsoe, Director of Equity Services, stated that ISD 194 schools "could pick and choose. One way we talked about distributing them was just to send out a Google form, right, finding out from our staff who wanted which poster. And that is the way we would distribute the posters then." (emphasis added). Responding, a Board member stated, "*and they could do with them after that what they want*." To which Ms. Lindsoe responded, "*Exactly*." (emphasis added).

g) Speaking of changing certain elements in the posters, Ms. Lindsoe stated, "so, a couple of the feedbacks that we did receive from the stakeholders that we have met. One was, they didn't see an Asian person in here. And so we are going to do that for the group one with the kiddos holding signs. And then another one was the student with the pigtails, they wanted to see . . . . our Native American students represented, so with braids. And that was coming from our Native American liaison."

h) In regard to finalizing the posters, Ms. Kass stated that, "so, as Lydia said, we'll be meeting with a couple more internal District leadership committees to gain some final input, and then from there we do plan just work with a printer to get a kind of initial order prepped before April, and then we'll launch the communication plan from there. One of the things our principals did ask

is just for some leadership talking points especially related to BLM ["Black Lives Matter"], so we will certainly share those with all of you as well, since we know that you've had quite a bit of Board communication on the topic."[28] As far as Appellants know, this was the first time the ironically named "Inclusive Poster Series"—which excludes divergent viewpoints—was discussed at an official District meeting.[29]

Consistent with these statements made by District personnel and board members, public reports stated that "the poster series went through a review process with focus groups that included students, school staff, school building leads, the School Board, community advisory groups and others."[30] Point being, the posters were created and revised by private individuals, members of committees without Board authority, and focus groups.[31] As a board member explained at an April 27, 2021 meeting, the posters were "vetted by students, staff, community advisory groups, and others to reflect our community."[32] It was "based on *their reviews* of the posters," that

---

[28] *Id.*

[29] App. 10; R. Doc. 17, Am. Compl. ¶ 37.

[30] App. 10–11; R. Doc. 17, Am. Compl. ¶ 38.

[31] App. 10–13, 25; R. Doc. 17, Am. Compl. ¶¶ 38–39, 69.

[32] *See* April 27, 2021 ISD 194 Regular School Board Meeting at 00:31:45-00:31:54, https://isd194letv.viebit.com/player.php?hash=5XPZCbrakrgG# (last visited Nov. 8, 2023).

"recommended changes were implemented."[33] There is no allegation or evidence that the District exercised editorial control over the posters. Instead, teachers, students, and community members came up with the idea for the posters, designed the posters, and edited them.[34] The only evidence of the School Board making *any* editorial decision was its minor decision to change a blonde girl holding a rainbow flag, saying "be proud of who you are," into a blonde boy.[35] The District did not convey its own message through the posters, but allowed private individuals to convey a political message in the schools' hallways and classrooms.[36]

Despite Superintendent Baumann's prior statements, around April 2021, the District officially allowed the posters. It paid for the poster series and allowed eight posters to be printed, two of which included the phrase "Black Lives Matter."[37] But the District does not exercise control over the placement of the posters within the schools' hallways and classrooms.[38] The new policy allows teachers and employees

---

[33] *Id.* at 00:31:54-00:32:01 (emphasis added); *see* App. 25; R. Doc. 17, Am. Compl. ¶ 69.

[34] App. 20; R. Doc. 17, Am. Compl. ¶ 54.

[35] App. 24; R. Doc. 17, Am. Compl. ¶ 67.

[36] App. 20; R. Doc. 17, Am. Compl. ¶ 54.

[37] App. 9–10; R. Doc. 17, Am. Compl. ¶ 34.

[38] App. 25; R. Doc. 17, Am. Compl. ¶ 70.

to select which posters to display, and where.[39] Indeed, the posters are available to order from a catalog.[40]

On the bottom of the posters, a statement was included: "At Lakeville Area Schools we believe Black Lives Matter and stand with the social justice movement this statement represents. This poster is aligned to School Board policy and an un-wavering commitment to our Black students, staff and community members."[41] The District never justified its violation of its own policy. But the explanation is found in Policy 535. Given Superintendent Baumann's previous admission that the "Black Lives Matter" posters would be the "endors[ement]" of a "specific political issue," the only way the posters were allowed in schools consistent with Policy 535 was with the "designat[ion] [of] specific property for facilities of the school district as limited public fora open for certain expressive activity."[42] Otherwise, the posters could not be "aligned to School Board policy."

### III. The District Continued to Acknowledge that "Black Lives Matter" is Reasonably Perceived as Support for a Radical Political Ideology.

The proof is not just in Superintendent Baumann's statements before authorizing the posters. The District has continued to admit that the slogan "Black Lives Matter"

---

[39] *Id.*

[40] App. 25; R. Doc. 17, Am. Compl. ¶ 71.

[41] App. 10; R. Doc. 17, Am. Compl. ¶ 34.

[42] App. 55–57; R. Doc. 26-1, Ex. 1 at 21–23.

is not a literal statement of the value of Black lives in the United States. In an April 26, 2021 email to Appellant Bob Cajune, District Equity Coordinator Lydia Lindsoe rejected a request to hang posters displaying "All Lives Matter" and "Blue Lives Matter" alongside the "Black Lives Matter" posters in District schools.[43] As Ms. Lindsoe admitted,

a) "[ISD 194] does not approve of All Lives Matter or Blue Lives Matter posters in the classrooms or other areas of the school, and teachers/school staff are not allowed to wear shirts with these sayings to school;"….

b) "the All Lives Matter and Blue Lives Matter mottos were created specifically in opposition to Black Lives Matter" and that those messages "effectively discount the struggle the Black students have faced in our school buildings and that Black individuals face in our society as a whole;"

c) "the history of Black people in America is singular and needs to be acknowledged;"

d) "it is important that we specifically affirm Black students in our schools;" and

e) because "Black people experience ["violence, racism, and oppression"] at the highest rate" and "[n]o other group was ever categorized as property or chattel, and the historical consequences of that experience are real and continue to be felt today," ISD 194 "does not approve All Lives Matter posters or Blue Lives Matter posters in classrooms."[44]

In other words, the District has admitted that the purpose of the poster series is not the literal meaning of the phrase "Black Lives Matter." Otherwise, the District would have allowed students or teachers hanging posters displaying "All Lives Matter," a subset of which are Black lives, or "Blue Lives Matter," a subset of which are also

---

[43] App. 18; R. Doc. 17, Am. Compl. ¶ 49.

[44] App. 18–19; R. Doc. 17, Am. Compl. ¶ 50.

Black lives.

The only other option is the political meaning of the phrase "Black Lives Matter": a neo-Marxist, separatist political organization which identifies Black Americans as "part of the global Black family" and seeks to "disrupt the Western-prescribed nuclear family structure."[45] The group, "Black Lives Matter at school," for example, expressly includes "antiracist" doctrine as part of its principles and encourages the emphasis of "Black Villages," which means "the disruption of Western nuclear family dynamics."[46] So-called "antiracism," as summarized by Ibram X. Kendi, author of "How to Be an Anti-Racist," involves "remedy[ing] past discrimination [through] present discrimination."[47] To the average observer and community member residing in the District, the phrase "Black Lives Matter" is inseparable from these tenets.[48]

Indeed, the Black Lives Matter Global Network Foundation is a political organization, and "Black Lives Matter" is its political slogan.[49] It has a fundraising arm, grassroots branches, and has created a Political Action Committee that has endorsed candidates for Congress and other partisan officers.[50] It has also created a list of

---

[45] App. 14; R. Doc. 17, Am. Compl. ¶ 41.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] App. 16; R. Doc. 17, Am. Compl. ¶ 45.

[50] *Id.*

demands which include "Convict and Ban Trump from future political office," and "Expel Republican members of Congress who attempted to overturn the election and incited a white supremacist attack."[51] The fact that Black Lives Matter is a political movement is no secret: the organization has said as much on its website: the group "continue(s) to honor our founding principles of grassroots organizing through BLM grassroots, which has chapters across the country and world. Our evolution of political courage became BLM PAC, a political power we now have in our toolbox to elect officials who create Black-affirming policies."[52] The addition of the words "Global Network" or "Global Network Foundation" to the "Black Lives Matter" motto does nothing to alter its underlying meaning, or perception to the general public, nor does the shorthand "BLM."[53]

Recent developments support this conclusion. The Indiana Attorney General agrees that "Black Lives Matter is a political organization."[54] Recognizing that posting "Black Lives Matter" in a school would amount to the endorsement of a political organization, the Indiana Attorney General stated:

> School corporations should be mindful to adopt neutral policies regarding the display of signs and other materials that are applied in a uniform and consistent manner to not favor any political group or organization.

---

[51] *Id.*

[52] App. 16; R. Doc. 17, Am. Compl. ¶ 46.

[53] App. 14–15; R. Doc. 17, Am. Compl. ¶ 42.

[54] App. 15; R. Doc. 17, Am. Compl. ¶ 43.

> They must ensure if they permit signs, displays, and other expressive materials or speech promoting one political organization, such as BLM, they must allow the same for all political and similar organizations. Likewise, if the school organization prohibits one political or similar organization from displaying signs or other expressive materials or speech, it must prohibit all political and similar organizations from displays, promotions, and exhibitions in its schools and on its premises, including BLM and other similar organizations.[55]

And scholarly research has found that implementing the "Black Lives Matter" political agenda on communities "dramatically amplif[ies] the use of terms associated with the BLM agenda throughout the movement's history."[56] The studies "establish[ed] a link between BLM's political rallies and increased use of antiracist terminology."[57] As the researchers summarized, "BLM aims to change American society by encouraging people to use terms such as 'systemic racism,' 'White supremacy,' and 'mass incarceration,'" which are drawn from antiracist theory."[58]

Finally, the reaction to the "Black Lives Matter" posters within the District demonstrates the same. A then-nine-year-old former student of the District recognized a connection between the posters and a political message. As she stated at the June 8, 2021 board meeting: "We all understand the meaning. It is a political message . . . . We all know changing the font or the color of posters does not change the

---

[55] App. 15–16; R. Doc. 17, Am. Compl. ¶ 44.

[56] App. 16–17; R. Doc. 17, Am. Compl. ¶ 47.

[57] *Id.*

[58] *Id.*

meaning. I am 9 years old, and I know that. You expect me to believe that you did not know what you were doing by making these posters? Come on, people."[59] Jim Bean III and his wife attended the May 28, 2021 School Board to "represent the millions of Black Americans who disagree with the Black Lives Matter movement" and recognize that "Black Lives Matter" is a Marxist organization which advocates for the destruction of the nuclear family—political messages.[60] And even those who support the hanging of the posters in Lakeville schools "believe that Black Lives matter is a political statement," it is just "a political statement [they] agree with."[61]

## IV. The District Rejected Appellants' Demand for Equal Treatment of Political Speech in the Designated Forum.

As discussed above, by permitting the display of the two posters with the organizational slogan for the "Black Lives Matter" political organization, the District *de facto* violated its own written policy against endorsement or expenditures on

---

[59] Carly Ortiz-Lytle, *Nine-year-old student slams school district after it allows Black Lives Matter posters despite promising no politics in school*, Washington Examiner (June 22, 2021), https://www.washingtonexaminer.com/news/viral-video-minnestota-black-lives-matter-posters-schools (accessed Nov. 10, 2021).

[60] Alpha News, *Concerned parents speak out against Black Lives Matter at school board meeting* (May 28, 2021), https://www.youtube.com/watch?v=px56i_n7vxk (accessed Nov. 16, 2023).

[61] Sean McPerson, *The Opposite of Black Lives Matter is Black Lives Don't Matter*, https://www.mcpherson.club/blog/the-opposite-of-black-lives-matter-is-black-lives-dont-matter (accessed Nov. 10, 2023).

political or controversial issues.[62] There is no evidence of the District opening its hallways and classrooms for political messages by private citizens previously.[63] Indeed, the district has invoked Policy 535 in order to keep other political messages out of schools.[64] As a result, in order to open up the hallways, *consistent with Policy 535*, as the District claims it did, it created a designated public forum for political expression. That means the District must abide by the same standards as apply in a public forum: "ensuring equality of treatment toward all candidate[s] and issues."[65]

The District, however, has done no such thing. Instead, when Appellant Bob Cajune sent an email to Ms. Lindsoe inquiring about the "Inclusive Poster Series" and asking whether other posters displaying "All Lives Matter" and "Blue Lives Matter" could be *included*, his request was rejected.[66] Further, because the posters "were requested by many staff and families in our school communities," they are favored private speech of certain members of the community.[67] To a reasonable member of the public, the District's allowance of *only* "Black Lives Matter" posters is intended to give one interest group in the community a monopoly on speech that promotes the

---

[62] App. 23–24; R. Doc. 17, Am. Compl. ¶ 63.

[63] App. 24; R. Doc. 17, Am. Compl. ¶ 65.

[64] *See* Golden, *supra* note 18.

[65] App. 25; R. Doc. 17, Am. Compl. ¶ 72 (ISD 194 Policy 535 IV(C)(2)).

[66] App. 18–19; R. Doc. 17, Am. Compl. ¶¶ 49–50.

[67] App. 20; R. Doc. 17, Am. Compl. ¶ 54.

political organization "Black Lives Matter" and its position in the "social justice movement."[68] Again, children within the District understand this. Former student N.W. told the School Board that by hanging the "Black Lives Matter" posters in Lakeville schools, she understood that a political movement was being endorsed: "school is no longer about education; school is about control and pushing agendas."[69]

## V. Procedural History.

Appellants sued the District and current superintendent Doug Van Zyl in his official capacity for viewpoint discrimination and compelled subsidy, in violation of the First Amendment. *See* 42 U.S.C. §§ 1983, 1988.[70] Appellants also requested leave for Joe Doe #1 and May Roes #1–7 to proceed pseudonymously, in fear of retaliation from political activists in the southern suburban Minneapolis metropolitan community.[71]

Appellees filed a motion to dismiss on January 11, 2023.[72] Appellees claimed that the named and unnamed plaintiffs lack standing and that the poster series was

---

[68] App. 19; R. Doc. 17, Am. Compl. ¶ 52.

[69] App. 19; R. Doc. 17, Am. Compl. ¶ 53.

[70] App. 27–28; R. Doc. 17, Am. Compl. ¶¶ 78–90.

[71] App. 65; R. Doc. 33, Motion to Proceed Pseudonymously.

[72] App. 31; R. Doc. 23, Motion to Dismiss.

exempt from any First Amendment scrutiny because it was government speech. In its memorandum opinion and order, the district court denied the motion to proceed pseudonymously and granted Appellees' motion to dismiss.[73] Appellants timely filed their notice of appeal.[74]

---

[73] App. 84; R. Doc. 38, Order.

[74] App. 86; R. Doc. 40, Notice of Appeal.

## SUMMARY OF THE ARGUMENT

> If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, we must exercise great caution before extending our government-speech precedents.

*Matal v. Tam*, 582 U.S. 218, 235 (2017).

That is exactly what Appellees have done: they have affixed their seal of approval on private speech in a way that excludes all disfavored viewpoints. The key to seeing past the façade of Appellees' claim of "government speech" is to examine the history of the speech at issue and compare that history with the District's Policy 535. The district court failed to do either.

Policy 535 has three parts that are relevant to this case which demonstrate that the District's only possible "government speech" is viewpoint neutrality, and the allowance of the poster series here is merely the affixing of a government seal of approval on private political speech.

First, there is the policy on District employees endorsing or opposing political issues: "School district employees . . . in the capacity of a school district employee, shall refrain from any conduct that is intended to be or that reasonably could be perceived as endorsing or opposing specific political issues or political candidates."[75] This is the policy that former Superintendent Michael Baumann previously

---

[75] App. 56–57; R. Doc. 26-1, Ex. 1 at 22–23 (ISD Policy 535 IV(A)(5)).

interpreted as prohibiting the hanging of "Black Lives Matter" ("BLM") posters by District employees.[76] And yet now these same District employees, who along with other community activists persistently demanded the ability to hang BLM posters on District property, are somehow doing just that by means of the poster series.

The second part of Policy 535 shows that while Appellees facilitated this speech (as any government hosting a public forum does), it is not the District's: "The school district will maintain neutrality as to all political campaigns and issues. The school district will not expend public funds or resources to advocate for a particular candidate or for only one side of a controversial question."[77] The District itself could not have endorsed the message of the two BLM posters in the poster series—it would have violated Policy 535. Again, the District's only possible "government speech" is its official viewpoint neutrality.

The third part of Policy 535 demonstrates that the District has created a designated public forum here: "The building principal, with approval of the superintendent and the School Board, may designate specific property for facilities of the school district as limited public fora open for certain expressive activity such as political speech."[78] This is the only way the District allows private expression on the

---

[76] App. 8–9; R. Doc. 17, Am. Compl. ¶¶ 27–32.

[77] App. 55; R. Doc. 26-1, Ex. 1 at 21 (ISD Policy 535 II(A)).

[78] App. 56; R. Doc. 26-1, Ex. 1 at 23 (ISD Policy 535 IV(C)(2)).

walls of its classrooms, on doors, and in hallways: through the creation of a designated public forum. And that is exactly what happened here. The District opened its walls as a designated public forum by allowing its employees to hang the BLM posters.

The district court, for its part, never even considered the implications of the District's policy in its government-speech analysis. Instead of "exercis[ing] great caution," it accepted the District's assertions at face value. *Contra Matal*, 582 U.S. at 235. By properly considering these posters in the context of District policy, it becomes apparent that the posters are private political speech created by citizen activists and hung based on personal decisions by District employees in a designated public forum. They are not "government speech" because the District prohibits itself from speaking on this issue.

The district court also failed to properly consider the history of how the posters were created. The District did not independently craft or control the messaging in the posters. Instead, the posters were created by private individuals, edited according to private individuals' requests, and are only hung in hallways and classrooms at the discretion of individual teachers.[79] The District *de facto* created a designated forum by laundering the private political speech of local activists and teachers under the

---

[79] App. 9–13; R. Doc. 17, Am. Compl. ¶¶ 33–39.

pretense of government speech, and discriminated against Appellants' speech by refusing to allow their posting in a similar fashion.[80]

Moreover, by using District resources to pay for this poster series, the District expended Appellants' taxpayer dollars and thus compelled Appellants to subsidize the speech of private local activists and like-minded employees, with which Appellants strongly disagree and which Appellants believe supports racism and racial inequality, instead of unity and equality.[81]

Finally, the district court abused its discretion in denying the Doe and Roe Appellants' request to proceed pseudonymously. The district court dismissed Appellants' genuine fears of reprisal based on the fact that they had already been assaulted and blocked from entering School Board meetings because of their speech.[82] And the district court failed to even consider if Appellees or the public had an interest in knowing who every Plaintiff-Appellant is that outweighs this genuine fear of retaliation.

---

[80] App. 25–26; R. Doc. 17, Am. Compl. ¶¶ 72–73.

[81] App. 25; R. Doc. 17, Am. Compl. ¶ 74.

[82] App. 74–75; R. Doc. 38, Order at 8; *see* App. 6–7; R. Doc. 17, Am. Compl. ¶ 21.

# ARGUMENT

## I.  Standard of Review.

This appeal comes from a dismissal of Appellants' claims on a Rule 12(b)(6) motion for failure to state a claim. The Court "reviews the grant of a motion to dismiss *de novo* taking the facts alleged in the . . . Complaint to be true." *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 955 (8th Cir. 2020). Motions to dismiss under Rule 12(b)(6) challenge the plausibility of a complaint pleaded under Fed. R. Civ. P. 8. Under that rule, a pleading must only contain a short and plain statement of the claim showing that the pleader is entitled to relief.

Consistently,

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Importantly, assuming the truth of the Complaint's allegations here, the Court must take all reasonable inferences in Appellants' favor. *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 730 (8th Cir. 2015).

This Court reviews the denial of a motion to proceed pseudonymously for abuse of discretion. *See Doe v. Univ. of Ark.*, 713 Fed. App'x 525, 526 (8th Cir. 2018) (unpublished per curiam); *Carrizosa v. Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1246 (11th Cir. 2020). Reversal is warranted if the Court concludes "that the district

court has made a clear error of judgment, or has applied the wrong legal standard." *Carrizosa*, 965 F.3d at 1246 (quotation omitted).

## II. The Poster Series Does Not Constitute Government Speech Under *Shurtleff*'s Holistic Analysis.

"The government-speech doctrine recognizes that the Free Speech Clause of the First Amendment 'restricts government regulation of private speech' but 'does not regulate government speech.'" *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1595 (2022) (Alito, J., concurring) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)). Although the government is free to speak for itself, it violates the First Amendment when it impermissibly "regulate[s] private expression." *Shurtleff*, 142 S. Ct. at 1589. Indeed, the Supreme Court has recognized that there is a "legitimate concern that the government speech doctrine not be used as a subterfuge for favoring certain private speakers over others based on viewpoint." *Summum*, 555 U.S. at 473. It is "a doctrine susceptible to dangerous misuse." *Matal*, 582 U.S. at 235. "If private speech could be passed off as government speech simply by affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id.* As a result, courts "must exercise great caution before extending [any] government-speech precedents." *Id.*

The district court exercised no such caution here. It failed to follow the Supreme Court's instructions in *Shurtleff* to "conduct a holistic inquiry . . . driven by a case's context rather than the rote application of rigid factors." 142 S. Ct. at 1589. That

inquiring involves looking "to several types of evidence to guide the analysis, including: the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589–90. But the central question is "whether the government intends to speak for itself or to regulate private expression." *Id.* at 1589; *see also id.* at 1596 ("The ultimate question is whether the government is actually expressing its own views or the real speaker is a private party and the government is surreptitiously engaged in the 'regulation of private speech.'" (quoting *Summum*, 555 U.S. at 467)) (Alito, J., concurring). When properly examining the poster series in context through this holistic inquiry, it becomes clear that the District gave its "seal of approval" to the posters in order to "silence or muffle the expression of disfavored viewpoints." *Matal*, 582 U.S. at 235.

### A.   There is no historical evidence that the District has used posters in schools hung by teachers to convey a government message.

As the district court recognized, courts have not held that schools are traditional public forums.[83] *See also Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1011–12 (9th Cir. 2000). But the question is not whether schools in general welcome private messages on the schools' hallways and classrooms. Instead, the court "must examine the details of *this* [poster series]." *Shurtleff*, 142 S. Ct. at 1591; *see also id.* at 1586–

---

[83] *See* App. 78; R. Doc. 38, Order at 12.

97 ("But in determining whether speech is the government's, the real question is not whether a form of expression is *usually* linked with the government but whether the speech *at issue* expresses the government's own message.") (Alito, J., concurring).

And in this case, there is *no* history of the District using a poster series like this one to convey a message or opening the hallways to private messages.[84] In fact, the District's formal position is viewpoint neutrality on all political issues, and as to this very speech, it previously used Policy 535 to keep the message *out* of the school.[85]

That fact means this case is a far cry from previous cases where the expression at issue was government speech. For example, when the Supreme Court held that personalized license plates were in fact government speech, the Court noted that "license plates have conveyed more than state names and vehicle identification numbers, they long have communicated messages from the States." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–13 (2015). And in *Summum*, where the Court held that privately donated monuments were government speech, the Court explained that "[g]overnments have long used monuments to speak to the public." 555 U.S. at 470. Even in *Shurtleff*, where the flags flown by the City of Boston were *not* government speech, the Court acknowledged that the history was in the City's favor

---

[84] App. 24; R. Doc. 17, Am. Compl. ¶ 65.

[85] *See* Golden, *supra* note 18.

because "flags on Boston's City Hall Plaza usually convey the city's messages." 142 S. Ct. at 1591.

This case is thus much more like *Cornelius v. NAACP Legal Defense and Education Fund*, 473 U.S. 788 (1985). There, the Court held that the Combined Federal Campaign, a charity drive aimed at federal employees, was a nonpublic forum. *Id.* at 806. As the Supreme Court explained in *Walker*, that forum did not amount to government speech because it "had never been a medium for government speech." 576 U.S. at 218. Instead, it was created to better organize the solicitation process "which had previously consisted of ad hoc solicitation by individual charitable organizations." *Id.*; *see also Higher Soc'y of Ind. v. Tippecanoe Cnty.*, 858 F.3d 1113, 1117–18 (7th Cir. 2017) (holding that County's decision to deny private group permission to hold a rally on the County Courthouse steps was not government speech, in part, because "the record does not indicate any history of the courthouse being used for government speech, nor is there any history of governments using events conducted by private groups to deliver their own messages"). The same is true here: the District's hallways and classrooms "have never been a medium for government speech." In fact, District policy forbids it.[86] Thus, there is no history for the District to rely on in support of its claim that the posters are actually government speech.

---

[86] App. 55; R. Doc. 26-1, Ex. 1 at 21 (ISD Policy 535 II(A)).

## B. The history of the poster series' development shows that its political expression belongs to private activists.

Further, the history of *this* expression demonstrates that the poster series was never designed to "transmit the government's own message." *Shurtleff*, 142 S. Ct. at 1589. First, the poster series was not the District's idea. Instead, in 2020, after George Floyd's death and the resulting protests and riots, teachers and other activists within the District expressed a desire to hang "Black Lives Matter" posters in school.[87] Then-Superintendent Baumann rejected this because Policy 535 prohibits teachers from displaying political and controversial posters, like "Black Lives Matter" posters, in their classrooms.[88] While Baumann's rejection received negative comments from some District parents at a School Board meeting that same day, at that Board meeting and at the subsequent October 6 Work Session, Baumann maintained his stance on the BLM posters.[89]

Between October and December 2020, the Board never publicly discussed the creation or design of any BLM posters.[90] The first time such an idea came up at a Board meeting was on March 17, 2021, where the so-called "Inclusive Poster Series" was

---

[87] App. 8; R. Doc. 17, Am. Compl. ¶ 29.

[88] App. 8; R. Doc. 17, Am. Compl. ¶¶ 27, 29.

[89] App. 8–9; R. Doc. 17, Am. Compl. ¶¶ 30–31.

[90] App. 9; R. Doc. 17, Am. Compl. ¶ 33.

first unveiled to the Board.[91] Any claim that the District created the poster series is belied by the record. Based on Appellants' review of the open meetings conducted by the Board, at no time did the Board—the body responsible for the "care, management, and control" of the District, Minn. Stat. § 123B.09, subd. 1—actually call for the creation of the poster series or direct its design prior to the March 17, 2021 unveiling.[92]

At that unveiling, the District's board members and employees made several statements indicating that the posters were being made available at the request of private community activists.[93] Ms. Kass started off her presentation by saying that "the purpose and our goal here is really to provide clarity around Policy 535 . . . but also to meet the requests of several of our staff members looking to put up posters affirming our students and our classrooms."[94] Specifically, when she was discussing the two "Black Lives Matter" posters, she said they were "truly our reason for even doing the poster series," "to meet the needs of our staff who are looking to put up posters."[95] Similarly, Superintendent Baumann articulated the goal of the poster series as

---

[91] App. 10; R. Doc. 17, Am. Compl. ¶ 37.

[92] App. 10; R. Doc. 17, Am. Compl. ¶ 37.

[93] App. 11–13; R. Doc. 17, Am. Compl. ¶ 39.

[94] App. 11; R. Doc. 17, Am. Compl. ¶ 39(a).

[95] App. 11; R. Doc. 17, Am. Compl. ¶ 39(b).

"let[ting] teachers have the opportunity and to use these if they feel it has an instructional value or value in their classrooms."[96]

From there, the posters were edited at the request of community activists, teachers, and students.[97] Statements made by the Board confirm that the posters were "vett[ed]" through race-identified "liaison[s]," students, staff, advisory committees, the Equity group, internal district leadership committees, and other "stakeholders."[98] It was "based on their reviews of the posters," that recommended changes were implemented."[99] In sum, the District Board neither chose the message nor directed its design—and it supposedly left to teachers' discretion whether there would even be any speech at all.

### C. The public is more likely to perceive the author of the poster series as individual teachers and private activists, not the District.

Public perception also favors the Appellants here. Any reasonable community-member familiar with the history of the poster series would understand that the District did not create, develop, or design the posters. Furthermore, the District has done nothing to demonstrate that the posters "are meant to convey and have the effect of

---

[96] App. 12; R. Doc. 17, Am. Compl. ¶ 39(e).

[97] App. 10; R. Doc. 17, Am. Compl. ¶ 38.

[98] App. 11, 13; R. Doc. 17, Am. Compl. ¶ 39(c), (g)–(h).

[99] April 27, 2021 ISD 194 Regular School Board Meeting, *supra* note 32, at 00:31:54–00:32:01.

conveying a government message." *Summum*, 555 U.S. at 472. Instead, the District has left the hanging of the posters—if they are hung up at all—to individual teachers in their classrooms or in the hallway. *Cf. Ind. Univ. Chapter of Turning Point USA v. City of Bloomington*, 641 F. Supp. 3d 548, 561–62 (S.D. Ind. 2022) (unlike in this case, the public-perception factor supported the City because the City chose the location for the murals). Since the hanging of the posters rests in the discretion of individual teachers, the public is likely to deduce that the presence of the BLM poster in Homeroom A and its absence in Homeroom B speaks to the private speech of the respective teachers, not the District. *See Roach v. Stouffer*, 560 F.3d 860, 865–68 (8th Cir. 2009) (explaining that when the "literal speakers who bear the ultimate responsibility for the message," are not the State, the speech is less likely to be government speech).

The District's own messaging is the same. As then-Superintendent Baumann stated, the District was "not gonna go running around and hang every single one of these up all over the place . . . our intentions aren't necessarily to go around and make sure we hang them up everywhere."[100] As a result, this case is a far cry from *Women for America First v. Adams*, 21-485-cv, 2022 U.S. App. LEXIS 14645 (2d Cir. May 27, 2022). There, New York City employees and private citizens painted

---

[100] App. 12; R. Doc. 17, Am. Compl. ¶ 39(e).

the phrase "Black Lives Matter" on the street in Manhattan. *Id.* at \*3. The mural was part of Mayor Bill de Blasio's public endorsement of the "Black Lives Matter" political movement, and his promise that the city would get its own mural. *Id.* Indeed, the Mayor explicitly stated: "For all lives to matter, we must first make clear that black lives matter. That is why we approved the murals and met those words with action." *Id.* at \*5. The City specifically stated the murals were intended to "send[] a message that these are our values in New York City." *Id.* As a result, the Second Circuit held that the public would likely perceive the murals as government speech. There are no similar public statements in this case. Instead, the purpose of the murals has always been "to meet the requests of several of our staff members looking to put up posters affirming our students and our classroom."[101]

The District's inclusion of a "government seal" on each poster does not change this conclusion. If the addition of a small disclaimer on each poster could make them government speech, then the Supreme Court would not have said in *Matal v. Tam* that "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." 582 U.S. at 235. The poster statements, in small font, of the District's purpose or goal are not determinative when it comes to the public's

---

[101] App. 11; R. Doc. 17, Am. Compl. ¶ 39(b).

perception. A public observer with even a small amount of knowledge of the history of the BLM-poster controversy at the District, the creation of the posters, District Policy 535, and individual teacher's discretion in hanging the posters would perceive that the BLM posters are private political speech laundered by the District.

Nor does the fact that the posters are hung in a school make them government speech. The location a message is displayed certainly can influence how the public perceives who the speaker is. That is why the Supreme Court in *Summum* held that the monuments were "closely identified in the public mind with the [State]." 555 U.S. at 472. After all, "[i]t certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." *Id.* at 471. District Policy 535, however, makes clear that the reasoning of *Summum* does not apply here. The District itself must "maintain neutrality as to all political campaigns and issues."[102] So in order to allow the BLM posters in District schools, consistent with Policy 535, the District had to have created a designated public forum for political expression.[103] The District's *de facto* creation of a public forum means that "even if the public would ordinarily associate a [poster's] message with [the District], that is not necessarily true for the [posters] at issue here." *Shurtleff*, 142 S. Ct. at 1591; *see also*

---

[102] App. 55; R. Doc. 26-1, Ex. 1 at 21.

[103] App. 56–57; R. Doc. 26-1, Ex. 1 at 22–23.

*Gerlich v. Leath*, 861 F.3d 697, 707 (8th Cir. 2017) ("The government speech doctrine does not apply if a government entity has created a limited public forum for speech.").

**D.** **The District Court failed to recognize that displaying the phrase "Black Lives Matter" on a poster reasonably endorses a political movement, which is private political speech.**

In concluding that the "public is likely to perceive the posters as the District sending a supportive message to its students," the district court failed to "tak[e] the facts alleged in the . . . Complaint to be true." *Nelson Auto Ctr.*, 951 F.3d at 955. The amended complaint plausibly alleged that the "Black Lives Matter" slogan is inextricable from the neo-Marxist political movement of the same name.[104] To that end, the Amended Complaint alleged the clear testimony of a then-nine-year-old child associating the posters with a private, political movement.[105] The Amended Complaint also pointed out the Indiana Attorney General's identification of Black Lives Matter as political organization.[106] The Amended Complaint also alleged that research shows that where the "Black Lives Matter" mantra is prominent, there is a concomitant increase in the use of political terminology associated with the "Black Lives Matter" political movement, such as "systemic racism," "white supremacy,"

---

[104] App. 14–18; R. Doc. 17, Am. Compl. ¶¶ 41–48.

[105] App. 19–20; R. Doc. 17, Am. Compl. ¶ 53.

[106] App. 15–16; R. Doc. 17, Am. Compl. ¶¶ 43–44.

and "mass incarceration."[107] The public associates "Black Lives Matter" with a political movement of the same name. At a minimum, there is no legitimate reading of the Amended Complaint that fails to appreciate the controversial nature of the "Black Lives Matter" slogan and that many community members perceive it as a political message.

The District Court, however, devoted much time at oral arguments to defining what is a "neo-Marxist," or "separatist political organization."[108] These questions missed the point. The Court's task is not to determine *what* the poster series means to *counsel*,[109] but rather "the *public's* likely perception as to *who* (the government or a private person) is speaking." *Shurtleff*, 142 S. Ct. at 1589–90 (emphasis added). The fact that many members of the public associate the phrase "Black Lives Matter" with the explicitly political organization bearing the same name supports Appellants'

---

[107] App. 16; R. Doc. 17, Am. Compl. ¶ 47.

[108] R. Doc. 45, Tr. 32–37.

[109] Counsel did, however, provide the district court answers as to what the term "neo-Marxist" means in the Amended Complaint, as well as what Black Lives Matter likely means when the group said it intended to "disrupt the Western-prescribed nuclear family." The only item about which the district court asked which counsel did not define was what it meant to be part of the "global black family." R. Doc. 45, Tr. 32–37. So the district court's claim that counsel "could not provide clear answers" and merely "deflect[ed] that the phrases came from the Black Lives Matter Global Network Foundation website" is incorrect. App. 72; R. Doc. 38, Order at 6 n.1, 15 n.9. But this is largely beside the point because what matters is *who* the public would perceive to be speaking, not *how* the public would *define* that speech.

argument that those same private political activists are actually the ones speaking within the school. The district court's rabbit-trail into semantics was misguided because it focused on whether people might know all of the nuances of the Black Lives Matter political organization's stated beliefs, as opposed to the simple question of the perceived identity of the speaker.

### E.     As alleged in the Amended Complaint, the District did not actively shape or control the poster series.

Like in *Shurtleff*, "[t]he most salient feature of this case is that [the District] neither actively controlled these [posters' design] nor shaped the messages the [posters] sent." 142 S. Ct. at 1585–86. The March 17, 2021 Board meeting was the first and last meeting at which the poster series was discussed by the Board, and, with the exception of a few very minor changes, the posters were fully designed and complete.[110] The School Board itself never took credit for the design of the posters. Rather, the non-Board presenters informed the Board that they would be making certain changes based on "the feedback[] that we did receive from stakeholders that we have met."[111] For example, the community stakeholders expressed concern that "they didn't see an Asian person in" the posters, so the District added one.[112] And the

---

[110] App. 10–13; R. Doc. 17, Am. Compl. ¶¶ 37, 39.

[111] App. 13; R. Doc. 17, Am. Compl. ¶ 39(g).

[112] *Id.*

"Native American liaison" wanted to see "our Native American students represented," so a student with braids was added to one poster.[113] The final posters were "vetted by students, staff, community advisory groups, and others to reflect our community."[114] It was "based on their reviews of the posters," that "recommended changes were implemented."[115]

The *only* exception to this complete control by private activists is the Board's election to change a blonde girl holding a rainbow flag, saying "be proud of who you are," into a blonde boy.[116] That is the sum total of evidence that appears to be available to the public for the Board's so-called "control" over shaping the poster series, and it does not address the "Black Lives Matter" posters at the heart of this case.

These facts again make this case a far cry from existing government speech precedents. In *Summum*, for example, history demonstrated that "cities and other jurisdictions take some care in accepting donated monuments." 555 U.S. at 472. Those "decisionmakers select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics,

---

[113] *Id.*

[114] April 27, 2021 ISD 194 Regular School Board Meeting, *supra* note 33, at 00:31:45–00:31:54.

[115] *Id.* at 00:31:54–00:32:01.

[116] App. 24; R. Doc. 17, Am. Compl. ¶ 67.

history, and local culture." *Id.* Similarly, in *Walker*, the Supreme Court noted that "Texas 'has effectively controlled' the messages [conveyed] by exercising 'final approval authority.'" 576 U.S. at 213 (quoting *Summum*, 555 U.S. at 473). And in *Johanns v. Livestock Marketing Association*, 544 U.S. 550, 560 (2005), the Court held that a beef promotional campaign was government speech because "[t]he message set out in the beef promotions is from beginning to end the message established by the Federal government."

In this case, however, the facts are entirely reversed. It is the community activists that exercised "final approval authority." *Walker*, 576 U.S. at 213. The Board made edits and changes at the requests of community activists, and publicly acknowledged that it was these private individuals "vet[ing]" the final posters. Indeed, it was the community activists that demanded the posters in the first place. *See Matal*, 582 U.S. at 234 (explaining that trademarks are not government speech because the "Federal Government does not dream up these marks, and it does not edit marks submitted for registration"). So "from beginning to end the message" on the posters has been established by private parties. *Johanns*, 554 U.S. at 560.

Furthermore, the District exercises *no* control over where the posters are hung, and if they are hung at all. As then-Superintendent Baumann stated, the posters are available "if [teachers] feel is had an instructional value or value in their classrooms. . . . our intentions aren't necessarily to go around and make sure we hang

them up everywhere. It's really about what the classrooms and teachers want to do."[117] In other cases, however, a key aspect of control was the government's "decision to display it, or not display it." *McGriff v. City of Miami Beach*, No. 22-12863, 2023 U.S. App. LEXIS 28656, at *7 (11th Cir. Oct. 27, 2023). In *McGriff*, the City "provide[d] the space in which the exhibition [at issue] was housed." *Id.* In this case, however, the District has chosen not to "control how the [posters are] to be disseminated." *Id.* at 9.

To be sure, the District did pay for the final printing of the posters and set up a catalog for teachers to order them from.[118] But these organizational tasks are besides the point: "the key issue is whether [the District] shaped or controlled the [posters'] *content* and *meaning*." *Shurtleff*, 142 S. Ct. at 1586 (emphasis added). In *Shurtleff*, it did not matter that the City "maintained control over an event's date and time to avoid conflicts, and it maintained control over the plaza's physical premises." *Id.* The key fact was that "the city's practice was to approve flag raisings without exception." *Id.* As a result, the City could not reasonably claim that "all (or at least most) of the 50 unique flags it approved reflect particular city-approved values or views." *Id.* at 1592. Without "meaningful involvement in the selection of flags or the crafting of their messages," the flag flying practice could not be said to be

---

[117] App. 12; R. Doc. 17, Am. Compl. ¶ 39(e).

[118] App. 25; R. Doc. 17, Am. Compl. ¶¶ 70–71.

government speech. *Id.* at 1593. In both *Shurtleff* and this case, the government entity attempts to raise the government speech doctrine as a subterfuge for its real intent of viewpoint censorship.

Unlike in *Shurtleff*, however, the District here altered its historic practice vis-à-vis its school walls. Where Boston had a history of rubber-stamping flag applications, the District had a history of keeping its walls free of private political messages.[119] Indeed, Policy 535(IV)(C)(2) prohibits both District employees and the District itself from appearing to endorse positions on political issues. The fact that the District ignored its ongoing *de jure* Policy against political signage in school to make this *de facto* exception based on political pressure from outside activists makes the District's case here far worse than Boston's in *Shurtleff*. The government-speech doctrine cannot shield the District from Appellants' First-Amendment challenge.

### III. Appellants Have Stated a Claim for Relief Under the First Amendment.

As explained above, the poster series is not government speech. That means it is subject to First Amendment scrutiny. *See Shurtleff*, 142 S. Ct. at 1593. Appellants have stated a claim to relief under the First Amendment, so this Court should allow the case to proceed. *See Brensahan v. City of St. Peters*, 58 F.4th 381, 384 (8th Cir.

---

[119] App. 24; R. Doc. 17, Am. Compl. ¶ 65.

2023) ("A claim survives a motion to dismiss if the complaint's nonconclusory allegations, accepted as true, make it plausible that the defendant is liable.").

### A. Appellees engaged in unconstitutional viewpoint discrimination.

> Discrimination against speech because of its message is presumed to be unconstitutional. . . . Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). The same is true "even when the limited public forum is one of [the government's] own creation." *Id.* So "[o]nce [the government] has opened a limited forum" it "must respect the lawful boundaries it has itself set." *Id.*

Here, Appellants have plausibly alleged that the District *de facto* created a limited public forum. When private groups initially demanded "Black Lives Matter" posters in District schools, then-Superintendent Baumann correctly recognized that posters displaying the BLM slogan were controversial and political, so District policy prohibited them.[120] The District never changed that stance. Instead, it allowed the posters as "aligned to School Board policy."[121] As explained above, the only way the posters could be permitted under Policy 535 is if the District designated a public forum and allowed private individuals to speak.

---

[120] *See* App. 8; R. Doc. 17, Am. Compl. ¶¶ 27, 29.

[121] App. 10; R. Doc. 17, Am. Compl. ¶ 34.

Even setting aside District policy, there can be no denying that the District "intentionally open[ed] a nontraditional forum for public discourse." *Walker*, 576 U.S. at 215 (quotations omitted). A school does so "by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Gerlich*, 861 F.3d at 705 (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 n.11 (2010)); *see also Speech First, Inc. v. Sands*, 69 F.4th 184, 214 (4th Cir. 2023) (explaining that the "government creates a designated [or limited] public forum when it purposefully makes property generally available to a class of speakers" (quotation omitted)). By opening up schools' hallways and posters for teachers to hang up "Black Lives Matter" posters, the District opened up school property to "the discussion of certain subjects." *Gerlich*, 861 F.3d at 705.

Once the District made that decision, it was unconstitutional to deny Appellants' request to let teachers and students hang "All Lives Matter" and "Blue Lives Matter" posters in the schools as well. The District denied that request solely because of Appellants' viewpoint. Ms. Lindsoe could not have been more clear when she stated the District "does not approve All Lives Matter posters or Blue Lives Matter posters in classrooms" because "Black people experience ["violence, racism, and oppression"] at the highest rate" and "[n]o other group was ever categorized as property or chattel, and the historical consequences of that experience are real and continue to

be felt today."[122] Further, Ms. Lindsoe, on behalf of the District, stated that "the All Lives Matter and Blue Lives Matter mottos were created specifically in opposition to Black Lives Matter" and that those messages "effectively discount the struggle the Black students have faced in our school buildings and that Black individuals face in our society as a whole."[123] Point being, the District *de facto* designated a public forum but has forbidden all other contrary viewpoints—and particularly viewpoints it deems contrary to the private activists to whom it has catered. That decision is blatant viewpoint discrimination in violation of the First Amendment. *See Wishnatsky v. Rovner*, 433 F.3d 608, 611 (8th Cir. 2006) ("We have said flatly, in light of fifty years of Supreme Court precedents, that denial of participation in a state-sponsored program based on the party's beliefs or advocacy is unconstitutional.").

### B.    The poster series constitutes a compelled subsidy that violates Appellants' First Amendment rights.

"As Jefferson famously put it, 'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical.'" *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018) (quoting A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950)). As detailed above, the BLM posters are private political speech,

---

[122] App.18–19; R. Doc. 17, Am. Compl. ¶ 50.

[123] *Id.*

and by facilitating this speech upon its walls, the District has rendered its walls a *de facto* designated public forum that should be open to Appellants' opposing viewpoints. By denying Appellants that right, the District has left the taxpaying Appellants with the receipt for private speech they find objectionable.

The District's current, exclusive allowance of only one viewpoint in its designated public forum effectively forces the Appellants, as local taxpayers, to "express[] support for a particular set of positions on controversial public issues," positions they find objectionable. *Id*. This situation is both demeaning to Appellants and violative of their First Amendment rights. *Id*.; *see also Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019) (holding that state law requiring group to endorse same-sex marriage in videos is "at odds with the 'cardinal constitutional command' against compelled speech" (quoting *Janus*, 138 S. Ct. at 2463)).

## IV. The Doe and Roe Plaintiffs Meet the Standard to Proceed Pseudonymously.

"Proceeding under a pseudonym in federal courts is, by all accounts, an unusual procedure. . . . Nevertheless, in certain limited circumstances, courts do allow a party to proceed under a pseudonym." *W.N.J. v. Yocom*, 257 F.3d 1171, 1172 (10th Cir. 2001) (quotations omitted). The Eighth Circuit has not yet issued a published opinion on what standard of review applies to the district court's denial of a Plaintiff's request to proceed pseudonymously. *See Univ. of Ark.*, 713 Fed. App'x at 526 (8th Cir.) (reviewing for abuse of discretion). But other circuits apply an abuse of

discretion standard of review. *See Carrizosa*, 965 F.3d at 1246; *Doe v. Village. of Deerfield*, 819 F.3d 372, 376 (7th Cir. 2016); *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 190 (2d Cir. 2008); *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004). Applying this standard, this Court should reverse if it concludes "that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Carrizosa*, 965 F.3d at 1246 (quotation omitted).

Admittedly, "[t]he use of fictitious names is disfavored." *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). However, "in narrow circumstances it is possible to overcome the presumption that parties' identities are public information, and the possible prejudice to the opposing party from conceal-ment. . . . A party seeking to proceed by pseudonym must show[] that the harm to the [party] . . . exceeds the likely harm from concealment." *Roe v. Dettelbach*, 59 F.4th 255, 259 (7th Cir. 2023) (quotations omitted). The "legitimate fear[] of future retribution" is one circumstance justifying permission to appear anonymously. *Village of Deerfield*, 819 F.3d at 377. This is especially true in cases that "implicate deeply held beliefs and provoke intense emotional responses." *Doe 3 v. Elmbrook Sch. Dist.*, 658 F.3d 710, 723 (7th Cir. 2011), *rev'd en banc*, 687 F.3d 840 (7th Cir. 2012) (vacating on other grounds).

No one can deny that the current political climate in our country is volatile, and Appellants have given ample examples of how local political activists associated

with the "Black Lives Matter" political viewpoint have engaged in retaliation against them and other Minnesotans.[124] One example was intentional discrimination with Bittersweet Bakery's business in the nearby suburb of Eagan, Minnesota.[125] Another was the wrongful termination of HomeTown Bank employee Tara McNeally based on her mild criticism of a different School Board in the metropolitan area.[126] Additionally, Appellants themselves faced physical violence when Black Lives Matter activists physically blocked them from entering School Board meetings and assaulted them.[127]

But the district court failed to give any credit to the Roe and Doe Appellants' well-pleaded concerns about "cancel culture" in the southern suburban Minneapolis metropolitan community.[128] The court dismissed examples of "cancel culture" for lack of a direct connection to the poster series. There should be no requirement, however, that Appellants wait to face actual retaliation before they can be protected by anonymity. *See Elmbrook Sch. Dist.*, 658 F.3d at 723–24 (recognizing the risk of "potential danger"). And, more shockingly, the district court ignored Appellants'

---

[124] *See* App. 6–7; R. Doc. 17, Am. Compl. ¶ 21.

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *See* App. 74–75; R. Doc. 38, Order at 8–9.

well-pleaded factual allegation that they have faced actual physical violence and assault because "the alleged misbehavior stopped after Plaintiffs complained."[129] This conclusion unreasonably disregarded Appellants' reasonable concern that retaliation and unlawful actions could resume at any time, especially if Appellants prove successful in this lawsuit. *See Elmbrook Sch. Dist.*, 658 F.3d at 723–24 (explaining that unnamed plaintiffs have faced "past retaliation").

Furthermore, the district court "did not balance plaintiff's intertest in proceeding anonymously against the interests of defendants and the public." *Sealed Plaintiff*, 537 F.3d at 191. In this case, those interests are weak. This is a First Amendment claim raising questions that are purely legal in nature. Deciding this case hinges on the Court's interpretation of the District's conduct: whether it intentionally laundered private political expression as government speech in order to favor a certain viewpoint to the total exclusion of another. The unnamed Appellants' identities are immaterial to this legal question. *See United States v. Pilcher*, 950 F.3d 39, 42 (2d Cir. 2020) ("[B]ecause of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities." (quotation omitted)). Yet the district court made no mention of the District or public's

---

[129] App 75; R. Doc. 38, Order at 9.

interest in knowing the identity of all parties involved in this lawsuit. That failure is an error of law justifying reversal. *Sealed Plaintiff*, 537 F.3d at 190–91.

## CONCLUSION

For the reasons set forth herein, Appellants Bob Cajune, Cynthia Cajune, Kalynn Kay Aaker, LION 194, John Doe #1, Mary Roes #1-7, and minors S.W., C.W., O.W., H.W., by Kalynn Kay Aaker, respectfully request that this Court reverse the district court's grant of Appellees' motion to dismiss and denial of the motion to proceed pseudonymously and remand for further proceedings.

**UPPER MIDWEST LAW CENTER**

Dated: November 17, 2023

*/s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,503 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2310 in Times New Roman font, 14-point.

3.  The brief and addendum have been scanned for viruses and are virus free.

**UPPER MIDWEST LAW CENTER**

Dated: November 17, 2023

_____*/s/ James V. F. Dickey*_____
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service has been accomplished by the CM/ECF system.

**UPPER MIDWEST LAW CENTER**

Dated: November 17, 2023

 */s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Appellants*